THOMAS F. WILSON *vs.* EPHRAIM M. OLLMAN.

AUGUST 5, 1948.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

Flynn, C. J.   This bill in equity was brought to compel the respondent to specifically perform an oral agreement to sell to the complainant certain shares of capital stock in two Rhode Island corporations.  After a hearing in the superior court on bill, answer and evidence, a decree was entered denying and dismissing the bill.  From that decree the complainant has duly prosecuted his appeal to this court.

Complainant Thomas F. Wilson owned or controlled fifty per cent of the capital stock in Big Chief Corporation, hereinafter called Big Chief, which operates a supermarket in Providence.  He also owned fifty per cent of the capital stock in Chapman Corporation, hereinafter called Chapman, which owned certain land that was used for parking by customers of the market.

Respondent Ephraim M. Qllman owned the other fifty per cent of the capital stock in each of these corporations. He also owned fifty per cent of the capital stock in York State Creameries, Inc., hereinafter called York State, which operated the meat and dairy products concession in the market.  It formerly held a lease from Big Chief on a percentage rental basis, but that had expired and rent was being paid weekly on a decreased percentage basis.  The other shares of capital stock in York State were owned by Edward Alpert, who desired to retire.

It is not disputed that there were some negotiations between the parties for the sale of York State's fixtures to Big Chief and for the sale to the complainant personally of respondent's capital stock in Big Chief and Chapman.

But the testimony of the parties as to certain material details of such negotiations and the result thereof is sharply conflicting.

The evidence for the complainant is to the following effect. On October 13, 1945 the respondent came to his office and desired to sell York State's fixtures and equipment, preparatory to its liquidation, and also to sell out his entire interest in Big Chief and Chapman. Complainant agreed then to cause Big Chief to buy York State's fixtures for $7000 and to release York State and its owners from any obligations under its lease. It was also agreed that complainant would purchase and the respondent would sell the latter's capital stock in Big Chief and Chapman so that the respondent could retire completely from all active business, as he desired.

According to complainant, both agreements were initiated by the respondent; they were made orally at the same time and place; and they were to be carried out together. It was intended, however, to reduce the agreement for the sale of respondent's stock to writing because the price of $55,000 was payable partly in cash and partly in notes over an extended period. A draft of such agreement in accordance with a memorandum kept by the complainant was made by his attorney and was submitted to the respondent. At the latter's request, in order to accommodate his tax purposes, a second draft was made whereby the sale would be consummated not later than January 2, 1946. Subsequently the respondent raised a question as to his personal indebtedness to Big Chief on a note in the sum of $2000, and after some further negotiations the complainant agreed to allow for its payment by increasing the purchase price of the stock to $57,000. Accordingly another draft of the agreement was then made by complainant. Still later the respondent requested other changes and finally a draft of the agreement according to respondent's view was made by his own Massachusetts attorney. This contained all such changes and was submitted to the complainant. After con-

sideration by his attorney, the complainant signed it and dated it October 31, 1945. This instrument, however, was never signed by the respondent.

On November 13, 1945 the transfer of York State's fixtures to Big Chief was effected as follows: York State conveyed its fixtures to Ollman and Alpert as tenants in common, and they in turn conveyed them to Big Chief. Each received a check from Big Chief for $3500, making the total purchase price $7000 for the fixtures in accordance with the oral agreement of October 13, 1945. Later that day complainant asked the respondent about the stock transaction, and the latter explained: "I am going right down to Mr. Shein's now." From that expression the complainant understood that the respondent intended to complete arrangements so that the stock transaction would take place that afternoon or the next day. It appears that Mr. Shein was the lawyer who had been representing York State but had not been representing the respondent personally in his previous negotiations for the sale of the stock. However, two days later the complainant received a telephone call from Mr. Shein stating that the respondent was present at his office and had authorized him to notify the complainant that he, the respondent, had changed his mind and did not intend to go through with the sale of his stock.

The complainant testified that negotiations in this connection had been going on for several years and that the respondent always made it clear that both transactions were tied together. He admitted, however, that it was intended that the agreement for the sale of respondent's stock was to be put in writing; that the memoranda which he made concerning conversations with the respondent or York State's attorney in connection with these matters were made by him contemporaneously with such conversations; and that none of such memoranda indicated that the two transactions were parts of one agreement or that they were interdependent and were to go through

together. He also admitted that none of the drafts of the agreement made any mention whatever of the alleged relationship between the two transactions.

The evidence for the respondent admitted certain of the details of the negotiations but directly denied others. He agreed that he initiated, with Alpert's consent, the negotiations on behalf of York State for the sale of its fixtures to Big Chief but he denied that there was then any talk or intention to make that sale a condition of the proposed sale of his stock to the complainant. According to him the details of the York State transaction were completed and agreed to before the complainant asked if he wanted to sell his stock in Big Chief and Chapman. He admitted that when it was first suggested by complainant he began to consider the possibility of selling his shares of stock in both corporations; but he denied that he actually made any final oral agreement on October 13, 1945, or later, to sell them.

He further corroborated the complainant on the fact that it was intended from the beginning that this agreement, when made, should be in writing, and he admitted that certain changes' in and drafts of the proposed agreement were made by his attorney, but denied various other positive assertions of the complainant concerning the negotiations. He asserted that he had never finally agreed to sell his stock; that York State's transaction was separate and was completely negotiated on October 13, 1945 without any reference to or connection with the proposed agreement to sell his shares of stock to the complainant; and that such proposed sale of his stock was brought up after the complainant was notified that Alpert had consented to the other agreement as it had been negotiated.

The trial justice in a written rescript considered the relative positions and attitudes of the parties, discussed the important parts of the evidence, and finally concluded that the respondent, notwithstanding his testimony to the contrary, nevertheless had agreed orally on October 13, 1945

to sell his capital stock in Big Chief and Chapman to the complainant personally. However, he was unable to agree with the complainant that. York State's sale of fixtures to Big Chief and the sale of respondent's stock to the complainant personally were integral parts of one entire agreement and transaction, or that the agreement as to York State's fixtures was conditioned upon respondent's sale of his stock. He found that the sale of stock admittedly involved more than $500, and therefore came within the purview of G. L. 1938, chap. 459, §4 (1), the statute of frauds. Because there was no written memorandum of the agreement signed by the respondent and because the contracts were independent and separate,. he found that there was no sufficient part performance to satisfy that statute and therefore the bill was denied and dismissed.

The complainant contends substantially that the trial justice's finding that the transactions were separate and independent is not supported by the evidence; that this court is in as good a position to draw inferences from undisputed testimony as is the trial justice; and that there was sufficient part performance by the complainant to satisfy the statute of frauds. He concedes that if the transactions were distinct and separate agreements there was no such part performance. But he insists that a consideration of the evidence as to time, place and circumstances, the language used, the motives of the parties, and their conduct will show clearly that they intended both transactions to be integral parts of one agreement, so that performance of one was sufficient to take the other out of the statute of frauds.

The principles of law applicable to the instant cause are not seriously disputed. The controlling question is whether there was sufficient part performance to take this oral agreement out of the statute of frauds. The answer to that question depends upon whether the transactions were separate and independent agreements, as the trial justice found,

or were integral parts of one and the same agreement, as complainant contends.

We agree with the complainant that this question is one of fact to be decided upon the evidence, and that this court is in as good a position to draw inferences from undisputed testimony as is the trial justice. However, the evidence here is conflicting and we do not agree with his contention that the trial justice's conclusion upon this issue was clearly wrong. In our opinion the evidence as a whole is reasonably open to the conclusion that the transaction as to York State's fixtures was not intended or made a part or condition of the respondent's agreement to sell his stock. There is evidence to show that such transaction was solely between two corporations and was negotiated by a representative of each, whereas the stock transaction was entirely between two individuals; and that the negotiations concerning York State were started by respondent and were completed on October 13, 1945 as an oral agreement *before* the complainant inquired as to the possibility that respondent might consider selling his shares of stock.

Complainant admittedly was an experienced and methodical businessman. He customarily made substantial memoranda of important negotiations, whether such were conducted by telephone or personal interview. Certain memoranda concerning these negotiations were introduced in evidence. Significantly none of them gives the slightest indication that the sale of York State's fixtures to Big Chief was proposed or accepted on the condition that the respondent would sell his capital stock in Big Chief and Chapman, or that the two transactions had been discussed as part of one agreement, or that complainant was being induced by respondent to so treat them. Further, both parties agree that it was intended to reduce this agreement to writing. But the successive drafts thereof, whether prepared by the complainant and his attorney or by the respondent's attorney, con-

tain no reference whatever, expressly or by implication, to the effect that the sale of York State's fixtures was in any way dependent upon or related to the respondent's sale of his stock.

The complainant further contends that the only reasonable explanation of the respondent's conduct in negotiating a sale of York State's fixtures, in liquidating that corporation, and in obtaining releases from the leasehold liabilities is that he also intended to sever entirely all business connections with Big Chief and Chapman. From our reading of the transcript, however, a contrary explanation as outlined by the trial justice is also reasonable. In his rescript he stated: "There would seem to be no dependence, one upon the other. It is perhaps evident that while Ollman was interested in a concession in the supermarket he would think it wise not to relinquish stock in the corporation housing the concession, but it does not follow that if Ollman relinquished his interest in a concession that he would then desire to sell his stock in, in this case the Big Chief Corporation."

The burden is upon the complainant here to show that the trial justice's decision is clearly wrong. In our opinion the evidence is conflicting and the complainant has not sustained that burden. The conclusion of the trial justice that the two transactions were separate and independent is reasonably supported by the evidence, and therefore we cannot say that his decision is clearly wrong.

The complainant's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Hinckley, Allen, Tillinghast & Wheeler, S. Everett Wilkins, Jr., Edward M. Watson,* for complainant.

*Edwards & Angell, William H. Edwards, Ernest L. Shein,* for respondent.